UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THEODORE SETTLES,

        Petitioner,

                                CASE NO. 2:06-CV-10496

   v.                            JUDGE AVERN COHN
                                MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE LAFLER,

        Respondent.

_____/


# REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    D.    *Substitute Counsel (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    E.    *Ineffective Assistance of Counsel (Claims I & III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            a. Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            b. Late Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            c. Failure to Challenge DNA Evidence and Seek Defense Expert . . . . . . . . . . . . . . . 17
            d. Failure to Seek Probable Cause Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            e. Failure to Object to Irrelevant Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            f. Failure to Request Lesser Offense Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    F.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.     *Procedural History*

1.     Petitioner Theodore Settles is a state prisoner, currently confined at the Boyer Road Correctional Facility in Carson City, Michigan.

2.     On April 10, 2003, petitioner was convicted of two counts of first degree criminal sexual conduct (CSC-I), MICH. COMP. LAWS § 750.520b; and three counts of second degree criminal sexual conduct (CSC-II), MICH. COMP. LAWS § 750.520c, following a jury trial in the Wayne County Circuit Court. On May 1, 2003, he was sentenced to concurrent terms of 124-250 months' (ten years, four months to twenty years, ten months) imprisonment on the CSC-I convictions, and to concurrent terms of 5-15 years' imprisonment on the CSC-II convictions.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     DEFENDANT WAS DEPRIVED OF HIS AMS V AND XIV RIGHTS OF DUE PROCESS AND HIS AM VI RIGHT OF EFFECTIVE COUNSEL BECAUSE DEFENSE TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE BY DEVIATING FROM THE RULE RESPECTING JURY SELECTION AND BY NOT OBJECTING TO LATE DISCOVERY.

II.    DEFENDANT WAS DEPRIVED OF HIS AMS V AND XIV RIGHTS OF DUE PROCESS AND HIS AM VI RIGHT TO COUNSEL OF HIS CHOOSING WHEN THE COURT REFUSED HIS REQUEST FOR APPOINTMENT OF NEW COUNSEL.

Petitioner filed a supplemental *pro per* brief raising one additional claim:

THEODORE SETTLES WAS DEPRIVED OF HIS V AND XIV AMENDMENT RIGHTS OF DUE PROCESS, BECAUSE TRIAL COUNSEL FAILED TO OBJECT OR TO FILE ANY PRE-TRIAL MOTIONS IN CONCERNS OF THE

STATE'S DNA EVIDENCE, HE FAILED TO MOTION FOR A PROBABLE CAUSE HEARING IN REGARD TO THE DELAY IN ARREST OF THE DEFENDANT, HE FAILED TO MOTION FOR AN EXPERT WITNESS FOR THE DEFENSE, AND FAILED TO OBJECT OR MOTION FOR A HEARING IN LIMINE TO COMBAT THE RELEVANCE OF TESTIMONY OF THE COMPLAINANT'S MOTHER, AND EXPERT TESTIMONY FOR THE STATE. TRIAL COUNSEL ALSO FAILED TO REQUEST THAT THE COURT GIVE LESSER INCLUDED OFFENSE INSTRUCTIONS TO THE JURY WHICH VIOLATED THE DEFENDANT'S RIGHTS WITH CONSTITUTIONAL ERROR.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Settles*, No. 249207, 2004 WL 2827681 (Mich. Ct. App. Dec. 9, 2004) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these three issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Settles*, 473 Mich. 884, 699 N.W.2d 704 (2005).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on February 6, 2006.  As grounds for the writ of habeas corpus, he raises the three claims that he raised in the state courts.  Petitioner filed a brief in support of his petition on August 4, 2006.

6.      Respondent filed his answer on August 9, 2006.  He contends that petitioner's claims are without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from several sexual assaults of his stepdaughter, Brittany Smith.  The evidence adduced at trial was accurately summarized in the brief filed by petitioner's counsel in the Michigan Court of Appeals:

        Brittany Smith testified that she lives at 19776 Stahelin in Detroit (II-36) with her siblings and Defendant, her stepfather, whom she calls Teddy.  (II-37) Her bedroom was downstairs and his was upstairs.  In March of 2000, when she was 13, Defendant called her upstairs to help her with her homework.  Only her younger sister was at home; her mother [was] at work.  (II-39) At such times she followed his rules.  The[y] were sitting on the bed and he helped her with her work and she

returned downstairs. A few days later these actions were repeated and "then he just came over there and hugged me and then he was trying to feel on me . . . like feel on my breast and my butt." (II-41) This was on the outside of her clothes and she told him to stop. (II-42) She returned downstairs and didn't go back upstairs "and he had an attitude about that". By this she meant he would tell her mother she did not do her chores when in fact she had done so. She did not tell her mother because she was scared of getting in trouble. (II-43)

A few days later the two of them went upstairs after he indicated he would not abuse her again but would help her with her homework. (II-44) She was not all right with this but needed the help. When they were upstairs he started feeling on her again, g[r]abbing her breast and then tried to get on top of her and would not stop when asked. (II-45) He pulled her pants and underwear down to her knees and "started having sex with me". (II-46) She described his penis in her vagina going back and forth, in and out. (II-47) She felt it inside of her and "It hurt" and she saw him ejaculate. (II-48) She pulled her clothes back on and ran downstairs. Defendant told her not to tell her mom or he would hurt her whole family. She told no one. (II-49) The whole procedure was repeated where she said he only went half-way. (II-50, 51) He never used a condom. Later, the touching continued. (II-52)

She then started feeling sick and tired and lazy and missed her period. (II-53) She though she might be pregnant. When she told Defendant he insisted she was not pregnant. She told her mother who said it might be that her cycle was changing. (II-54) Defendant bought her a pregnancy kit which indicated positive; she did another with the same result. (II-55) Defendant told her he had come up with a plan: that a man had come in her backyard and had a knife and raped her. She thought it was a good story. (II-57)

She told this to her mother at which point her mother started screaming and crying and wanted to call the police but Defendant said not to, they could handle it. Her mother then called her grandmother who did not believe the story. (II-58) She went to breakfast with her grandmother and then to her grandmother's house in Holly, Michigan where her mother joined them. At which time she told her mother it was Defendant. Her mother tried to call Defendant and then left (II-59) and filed a police report, (II-60) vowing to kill Defendant.

The family went to the mall where they contacted Sgt. Sanchez in the security room and told him of these events. (II-62) She then verified by ultrasound that she was 14 weeks pregnant (II-63) and told the examining doctor she wanted an abortion. (II-64)

The abortion was performed at Women's Clinic (II-65) after which blood for a DNA [test] was taken at Herman Kiefer, Detroit Health Department. (II-67)

On cross-examination Brittany repeated that Defendant touched her on five separate occasions, during two of which he inserted his penis into her vagina. (II-71) She acknowledged that during a day in March she had missed the bus and took the bus of a fellow student, Donald Brown. It stopped around the corner from his home and from there she walked to her home. (II-77) She denied spending any time at his house. (II-78, 82)

Monica Smith-Settles, Brittany's mother, confirmed Brittany's testimony. (II-93 et seq) It was Monica's stepfather, Robert Taylor, who made the medical appointments (II-103) and she who made the arrangements for the abortion, on June 27, 2000. (II-105) She consented to release the fetal tissue to Sgt. Sanchez. (II-107) After the procedure the nurse gave the tissue to Sanchez. (II-108) She said that Defendant maintained his innocence. (II-111)

Phlebotomist Denise Pettas took Defendant's blood. (II-137)

The officer in charge, State Police Sgt. Richard Sanchez, took a statement from Brittany (II-146) and went with her to the abortion clinic (II-147) following which he was given a container containing the fetus (II-149( which he took to the Detroit Police Forensic Lab (II-150) together with a vial of Brittany's blood. (II-153) He obtained a search warrant for Defendant's blood on October 14, 2002 which he also took to the lab. (II-156) When the Detroit lab could not handle it he took the materials to Heather Spillane at the Northville State Police post. (II-159, 160) The blood drawn from Brittany was taken on Sept. 23, 2002. (II-162)

Detroit Police Forensic scientist Paula Lightel said that fetal tissue deteriorates rapidly and is frozen [as] quickly as possible (II-175) and that her lab received the container on June 27 and Brittany's blood on Sept. 24, 2002 which she turned over to Sgt. Sanchez. (II-179) It was stored in her lab for four months. (II-181)

On November 7[, 2002] State Police Forensic scientist Spillane received from Sgt. Sanchez known blood samples from Brittany and Defendant and fetal tissue taken from Brittany. (II-204) She said that the fetal tissue consistent with the father, matched those found in the profile of Defendant and the same was true of the mother as consistent with Brittany. (II-210)

Marco Scarpetta, a DNA expert, opined that the odds were 12,900 to one that Defendant is not excluded from being the father of the fetal tissue from Brittany (III-18) and that he was 99.99992 [per cent] sure of his conclusions (III-22) that it is extremely likely that Defendant fathered the tissue. (III-23)

Def.-Appellant's Br. on Appeal, in *People v. Settles*, No. 249207 (Mich. Ct. App.), at 1-5.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Substitute Counsel (Claim II)*

In his second claim, petitioner contends that he was denied his right to counsel when the trial court failed to appoint substitute counsel to represent him. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, "[a]lthough the Sixth Amendment contemplates a right to counsel of choice, that right is generally cognizable only to the extent defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel." *Haynie v. Furlong*, No. 98-1177, 1999 WL 80144, at *1 (10th Cir. Feb. 17, 1999). As the Supreme Court has recently explained, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2565 (2006). Further, the right to counsel of one's choice is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket."). Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth

Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id*. (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). Because an indigent defendant has no absolute right to appointed counsel of his choice, and because the focus of the Sixth Amendment inquiry is on effective advocacy, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991); *accord United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998); *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990).

2. *Analysis*

The circumstances surrounding petitioner's request for substitute counsel were summarized by the Michigan Court of Appeals:

> At a pretrial hearing, defendant sought to ask the court for an independent DNA test. The court stated that he should discuss the matter with his lawyer. Defendant responded that he did not have a lawyer. Counsel then explained that defendant was not speaking with him on that day, that based on previous communications, counsel sent all the discovery materials to defendant, that defendant had indicated that he wished to represent himself, and that counsel had advised him that it would be unwise to do so, especially where there was scientific evidence involved. Counsel then asked defendant "Do you want to represent yourself or you want me to represent you?" Defendant responded "Not you, that's for sure. Not you." Counsel then stated that the court could relieve him, but he was not asking to withdraw, or asking his boss to relieve him. Defendant responded "I am." The court stated: "Well, your request to have new counsel is denied, Mr. Settles. If you want to at anytime hire your own lawyer, you are free to do that." Defendant responded "Okay." On the first day of trial, a short colloquy made clear that defendant had

> chosen to proceed with assigned counsel, rather than represent himself, but that he
> was unhappy with the choice. Again, he was not asked, and did not volunteer why
> he was dissatisfied with counsel.

*Settles*, 2004 WL 2827681, at *2, slip op. at 2-3. The court of appeals rejected petitioner's claim,

reasoning that although the court should have made a further inquiry regarding petitioner's

dissatisfaction with counsel, petitioner could not establish prejudice because his counsel performed

effectively at trial. *See id*. at *3, slip op. at 3. This determination was reasonable.

At the outset, petitioner failed to establish good cause for substitution of counsel, "such as

a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between

the attorney and the defendant." *Smith*, 923 F.2d at 1320. Petitioner does not allege that there was

any irreconcilable conflict between himself and counsel, or that counsel was acting with a conflict

of interest. While petitioner does contend that there was a breakdown in communication, he does

not allege the type of complete breakdown for which substitute counsel is warranted. Rather,

petitioner contends only that counsel was unprepared and had not presented various motions which

he thought should be brought. This is insufficient to constitute the type of complete breakdown

justifying appointment of substitute counsel. *See United States v. Carillo*, 161 Fed. Appx. 790, 793

(10th Cir. 2006); *cf. Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (there is no constitutional right to

a "meaningful attorney-client relationship."). It is apparent from the record that petitioner's

problems with counsel focused on differences in trial strategy. These differences provided no basis

for a substitution of counsel at such a late stage in the proceedings. *See United States v. Romero*,

27 Fed. Appx. 806, 807-08 (9th Cir. 2001); *United States v. Castro*, 908 F.2d 85, 88-89 (6th Cir.

1990); *Matsushita v. United States*, 842 F. Supp. 762, 763-64 (S.D.N.Y. 1994).

Further, even assuming that the trial court erred by not granting counsel's motion to

withdraw and appointing substitute counsel, petitioner's claim fails because any error was harmless. As noted above, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably by represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, the courts that have considered the issue have concluded that "[u]nless [a defendant] can establish an ineffective assistance claim under *Strickland v. Washington* . . . any error in the [trial] court's disposition of [the defendant's] motion for appointment of substitute counsel is harmless." *United States v. Graham*, 91 F.3d 213, 217 (D.C. Cir. 1996) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also*, *United States v. Calderon*, 127 F.2d 1314, 1343 (11th Cir. 1997); *United States v. Zillges*, 978 F.2d 369, 372-73 (7th Cir. 1992); *Bowie v. Renico*, No. 00-10013, 2002 WL 31749162, at *11 (E.D. Mich. Nov. 6, 2002) (Lawson, J.); *Stephens v. Costello*, 55 F. Supp. 2d 163, 172 (W.D.N.Y. 1999). As the Supreme Court has explained, "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Because, as explained in the remainder of this Report, petitioner was not deprived of the effective assistance of counsel, he has "no cognizable complaint."

This conclusion is not altered by the Supreme Court's decision in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006). In that case, the Court held that a defendant who has been denied his Sixth Amendment right to counsel of his choice need not demonstrate that his actual trial attorney was defective, or that he was prejudiced by counsel's deficient performance. *See id.* at 2562. Further, the Court held that a denial of the right to counsel of one's choice is a structural error, and thus harmless error review does not apply to such a denial. *See id.* at 2564-65. *Gonzalez-*

*Lopez* is inapplicable here, for two reasons.

First, *Gonzalez-Lopez* involved a defendant who had retained counsel to represent him but was denied the right to have his retained counsel appear on his behalf. Nothing in that decision purported to alter the rules applicable to an indigent defendant's right to appointed counsel of his choice. On the contrary, the Court explicitly reaffirmed the *Wheat* and *Caplin & Drysdale* conclusions that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 2565 (citing *Caplin & Drysdale*, 491 U.S. at 624; *Wheat*, 486 U.S. at 159). Thus, *Gonzales-Lopez* does not call into question the Court's prior observation that "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale*, 491 U.S. at 624; *see Garcia v. Quarterman*, No. H-06-0504, 2006 WL 2413714, at *14 (S.D. Tex. Aug. 18, 2006) (habeas relief not warranted based on failure to substitute appointed counsel where appointed counsel was not ineffective, notwithstanding *Gonzalez-Lopez*).

Second, even if *Gonzalez-Lopez* were otherwise applicable, petitioner would be entitled to the benefit of that decision because it did not constitute "clearly established law" at the time his conviction became final. Petitioner's application for leave to appeal was denied on July 26, 2005, and *Gonzales-Lopez* was not decided until 11 months later on June 26, 2006. Prior to *Gonzalez-Lopez*, the Supreme Court had never held that a prejudice analysis or harmless error review is inappropriate with respect to a claim of the denial of counsel of one's choice. *See Gonzalez-Lopez*, 126 S. Ct. at 2568 (Alito, J., dissenting). Thus, the Michigan Court of Appeal's analysis, which included a review for prejudice, was not "contrary to" or an "unreasonable application of" any "clearly established Federal law as determined by the Supreme Court" by the time petitioner's

conviction became final, as required for petitioner to obtain relief under § 2254(d)(1). *See Harris v. Diguglielmo*, No. 07-213, 2007 WL 3120065, at *11 (W.D. Pa. Oct. 22, 2007). Put another way, *Gonzalez-Lopez* amounts to a "new rule" of constitutional law which could not be applied on collateral review under the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989). *See Rodriguez v. Chandler*, 492 F.3d 863, 866 (7th Cir. 2007); *Peters v. Bell*, No. 1:06-cv-880, 2007 WL 3348011, at *1 (W.D. Mich. Nov. 8, 2007). The *Teague* rule is "the functional equivalent" of the clearly established law requirement of § 2254(d)(1), *see Williams*, 529 U.S. at 379 (opinion of Stevens, J.), and thus a rule which fails to satisfy *Teague* will also fail to satisfy § 2254(d)(1). *See id*. at 380 (opinion of Stevens, J.); *id*. at 412 (opinion of O'Connor, J., for the Court). *See generally*, *Williams v. Cain*, 229 F.3d 468, 474-75 (5th Cir. 2000) (discussing relationship between *Teague* and § 2254(d)(1)).

Thus, even if petitioner had established good cause for the appointment of substitute counsel, he is entitled to habeas relief only if counsel rendered constitutionally ineffective assistance at trial. As discussed more fully below, none of petitioner's ineffective assistance of counsel claims have merit. Thus, even if the trial court erred in denying counsel's motion to withdraw, petitioner was represented by an effective advocate for his case, in accordance with the "essential aim" of the Sixth Amendment right to counsel. *See Wheat*, 486 U.S. at 159. Because petitioner was "adequately represented by" court appointed counsel, he has "no cognizable complaint." *Caplin & Drysdale*, 491 U.S. at 624. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Ineffective Assistance of Counsel (Claims I & III)*

In the remainder of his habeas application, petitioner raises a number of claims relating to

the effectiveness of his trial counsel. Specifically, petitioner contends that counsel was ineffective for failing to: (1) properly conduct jury selection; (2) object to the late disclosure of discovery; (3) challenge the DNA evidence; (4) seek a probable cause hearing; (5) seek a defense expert; (6) object to irrelevant evidence; and (7) seek lesser included offense instructions. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the

exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.   *Analysis*

*a. Jury Selection*

Petitioner first contends that counsel was ineffective during jury selection by exercising some peremptory challenges as a group rather than individually. At some points during the jury selection process, both the prosecutor and defense counsel exercised more than one peremptory challenge at a single time, rather than exercising a single peremptory challenge and having the removed juror's spot on the venire filled by another potential juror. Petitioner contends that this procedure violated the Michigan Court Rule governing jury selection, and counsel was ineffective for failing to follow the correct procedure. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

First, petitioner cannot show that counsel's performance was deficient. Petitioner's argument is based on an old version of the Michigan Court Rules, which indeed required peremptory challenges to be exercised singularly and required the court to fill a vacated spot on the venire before receiving other challenges. *See People v. Miller*, 411 Mich. 321, 324-25, 307 N.W.2d 335, 336 (1981) (per curiam). However, the current version of the court rules, and the version in effect at the time of petitioner's trial, contemplates that peremptory challenges may be exercised together rather than singularly. The court rule regarding peremptory challenges provides that "[f]irst the plaintiff and then the defendant may exercise *one or more* peremptory challenges until each party

successively waives further peremptory challenges or all the challenges have been exercised[.]" MICH. CT. R. 2.511(E)(3)(a) (emphasis added).[1]  The rule further provides that "[a]fter the jurors have been seated in the jurors' box and a challenge for cause is sustained or a peremptory challenge *or challenges* exercised, another juror *or other jurors* must be selected and examined."  MICH. CT. R. 2.511(G) (emphasis added).  Thus, under the current version of the Rule 2.511, peremptory challenges need not be exercised singularly, and counsel did not misapprehend the rules governing jury selection.  *See Settles*, 2004 WL 2827681, at *1, slip op. at 1-2.[2]

Further, even assuming that counsel erred in failing to object to the trial court's procedure for jury selection, petitioner has failed to establish that he was prejudiced by counsel's deficient performance.  Petitioner argues only that counsel should have required the court to follow the court rule.  He "has advanced no hypothesis–beyond a bald assertion that counsel's performance was inadequate–that would demonstrate a reasonable probability of prejudice from [the selection method employed by the trial court].  He has introduced no set of fact suggesting bias of one or more of the jurors; nor has he alleged that the panel was tainted by the intentional exclusion of a significant segment of the community."  *United States v. Taylor*, 832 F.2d 1187, 1196 (10th Cir. 1987).

---

[1]Although the court rules governing criminal trials provide for different numbers of peremptory challenges than Rules 2.510 and 2.511–the rules which govern jury selection in general–the procedures for selecting the jury set forth in Rule 2.511 govern jury selection in criminal trials.  *See* MICH. CT. R. 6.412(A).

[2]There is nothing in the record which suggests that the trial court *required* the parties to exercise multiple peremptory challenges at one time, rather than merely *permitted* them to do so.  Even under the old version of the court rules and the holding of *Miller*, "it is not error requiring reversal where a defendant does not object to the method employed and he is merely *permitted* to exercise multiple challenges."  *People v. Jones*, No. 209512, 1999 WL 33437947, at *3 (Mich. Ct. App. Aug. 13, 1999) (per curiam); *see also*, *People v. Koan*, No. 217842, 2000 WL 33418834, at *1 (Mich. Ct. App. June 9, 2000) (per curiam); *cf. People v. Lawless*, 136 Mich. App. 628, 636, 357 N.W.2d 724, 728 (1984).

Because petitioner can demonstrate neither that counsel's performance was deficient nor that he was prejudiced by the jury selection procedures, he is not entitled to habeas relief on this claim.

### b. Late Discovery

Petitioner next contends that his counsel was ineffective for failing to object to the prosecutor's late provision of discovery. On the morning of the first day of trial, the prosecutor provided petitioner's counsel with copies of medical records. Counsel indicated that he was aware of these records and had discussed them with petitioner, and the parties stipulated to the admission of the medical records. *See* Trial Tr., dated 4/8/03, at 3-4. The Michigan Court of Appeals rejected petitioner's claim, concluding that counsel's performance in failing to object to the late discovery was not deficient because he had been aware of the records and had discussed them with petitioner, and because petitioner had failed to show prejudice from the late production. *See Settles*, 2004 WL 2827681, at *1, slip op. at 2. The Court should conclude that this determination was reasonable.

Even assuming that counsel should have objected to the late production of the medical records, petitioner has failed to demonstrate any prejudice. As counsel indicated, he was aware of the medical records and had discussed them with petitioner. Thus, the production of the records did not come as a surprise or require counsel to assimilate new information into his case. Further, the only medical records discussed at trial were the records relating to the abortion performed on the victim. *See* Trial Tr., dated 4/9/03, at 106. This fact was well known to counsel and petitioner, and petitioner has not suggested that any information in the medical records would have contradicted the trial testimony or provided exculpatory evidence. Thus, petitioner cannot establish that he was prejudiced by counsel's failure to object to the late-provided discovery, and he is therefore not entitled to habeas relief on this claim.

17

### c. Failure to Challenge DNA Evidence and Seek Defense Expert

Petitioner next argues that counsel was ineffective for failing to challenge the prosecutor's DNA evidence through a pretrial motion to exclude this evidence, and for failing to obtain a defense DNA expert. The Michigan Court of Appeals rejected these claims, reasoning that "[c]ounsel was not ineffective in failing to secure the exclusion of the DNA evidence because the evidence was admissible to show that defendant had impregnated his daughter," and that petitioner failed to show "that an independent DNA expert would have testified any differently than the expert who testified." *Settles*, 2004 WL 2827681, at *3, slip op. at 3. The Court should conclude that these determinations were reasonable, and therefore that petitioner is not entitled to habeas relief on these claims.

Before addressing petitioner's argument, a brief background of the standards for admission of scientific evidence is necessary. At the time of petitioner's conviction, the Michigan courts applied the oft-used, and oft-criticized, framework established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In *Frye*, the court established what came to be known as the "general acceptance" test for determining whether new or novel scientific techniques may be admitted into evidence. The court explained:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs*.

*Frye*, 293 F. at 1014 (emphasis added). Although not explicitly "adopting" the *Frye* standard, the Michigan Supreme Court employed a similar analysis in *People v. Davis*, 343 Mich. 348, 370-72, 72 N.W.2d 269, 281-82 (1955), and the Michigan courts have interpreted *Davis* as adopting the *Frye*

rule. *See People v. Young*, 418 Mich. 1, 17-20, 340 N.W.2d 805, 812-13 (1983); *People v. Haywood*, 209 Mich. App. 217, 221, 530 N.W.2d 497, 499-500 (1995). Under the *Davis/Frye* rule, as it is known, novel scientific evidence is inadmissible unless the proponent of the evidence demonstrates that it has been generally accepted in the relevant scientific community. *See Haywood*, 209 Mich. App. at 221, 530 N.W.2d at 500.

Much of petitioner's argument focuses on the alleged failure of the prosecutor to establish the admissibility of the DNA evidence under the standards set forth in Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Effective January 1, 2004, Michigan amended its own Rule 702 to mirror the federal rule. As the Michigan Supreme Court has explained, this amendment to Rule 702 explicitly incorporates the reliability standards identified by the United States Supreme Court in *Daubert*. *See Gilbert v. DamilerChrysler Corp.*, 470 Mich. 749, 781, 685 N.W.2d 391, 408 (2004). At the time of petitioner's trial and appeal, however, the *Davis/Frye* test was the means by which the admissibility of scientific evidence was determined in Michigan. *See Coy II*, 258 Mich. App. at 10 n.3, 669 N.W.2d at 838 n.3; *People v. McMillan*, 213 Mich. App. 134, 137 n.2, 539 N.W.2d 553, 555 n.2 (1995). Counsel cannot be deemed ineffective for failing to anticipate this change in the law and arguing for the inadmissibility of the evidence under the *Daubert* standard. *See Nichols v. United States*, 501 F.3d 542, 545 (6th Cir. 2007); *Mullican v. United States*, 469 F. Supp. 2d 498, 504 (E.D. Tenn. 2007).

Nor can petitioner show that counsel was ineffective for failing to object to the evidence under the *Davis/Frye* standard, because any such objection would have been futile. Although no Michigan case addresses the precise issue here–admissibility of statistical DNA evidence of

paternity–several lines of cases lead to the conclusion that such evidence is admissible. First, there is no question that the polymerase chain reaction (PCR) method of DNA testing–the type used in petitioner's case–is sufficiently reliable to be admitted. The "courts have repeatedly held that the PCR method rests on a sufficiently reliable basis to be admitted under Federal Rule of Evidence 702 or state analogues. Indeed, several courts, including the Michigan courts, have concluded that 'the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts . . . to take judicial notice of it[.]'" *Coy v. Renico*, 414 F. Supp. 2d 744, 761-62 (E.D. Mich. 2006) (Rosen, J.) (citations omitted) (quoting *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996 and citing *United States v. Trala*, 386 F.3d 536, 541-42 (3d Cir. 2004); *United States v. Boswell*, 270 F.3d 1200, 1204-05 (8th Cir. 2001); *United States v. Shea*, 159 F.3d 37, 41 (1st Cir. 1998); *United States v. Gaines*, 979 F. Supp. 1429, 1433 n.4 (S.D. Fla. 1997) (citing decisions of over 20 state appellate courts); *People v. Coy*, 243 Mich. App. 283, 291-92, 620 N.W.2d 888, 893-94 (2000)).

Second, the Michigan Court of Appeals "has continued to reject *Davis-Frye* challenges to statistical analysis of DNA evidence, finding such arguments are relevant to the weight of the evidence, not its admissibility." *People v. Coy*, 258 Mich. App. 1, 11, 669 N.W.2d 831, 838-39 (2003) (per curiam) (discussing and citing *People v. Holtzer*, 255 Mich. App. 478, 491, 660 N.W.2d 405, 412 (2003); *People v. Leonard*, 224 Mich. App. 569, 591, 569 N.W.2d 663, 673 (1997); *People v. Chandler*, 211 Mich. App. 604, 611, 536 N.W.2d 799, 803 (1995)); *see also*, *Murphy v. Elo*, No. 97-CV-76017-DT, 2005 WL 2284223, at *12 (E.D. Mich. Sept. 1, 2005) (Cohn, J., adopting Report of Komives, M.J.), *aff'd*, ___ Fed. Appx. ___, 2007 WL 2962535 (6th Cir. Oct. 10, 2007). Indeed, "the courts have recognized that '[s]tatistical probabilities are basic to DNA analysis and their use has been widely researched and discussed.'" *Coy*, 414 F. Supp. 2d at 762 (quoting *United States v.*

*Davis*, 40 F.3d 1069, 1075 (10th Cir. 1994) and citing *United States v. Chischilly*, 30 F.3d 1144, 1153 (9th Cir. 1994); *United States v. Bonds*, 12 F.3d 540, 557, 565-66 (6th Cir. 1994); *Reid v. Page*, 47 F. Supp. 2d 1008, 1012-13 (C.D. Ill. 1999); *State v. Loftus*, 573 N.W.2d 167, 174-75 (S.D. 1997)).

And third, although the case involved a blood antigen paternity test rather than a DNA paternity test, the Michigan Court of Appeals has upheld the introduction of a statistical paternity analysis to establish penetration in a criminal sexual conduct case. *See People v. Taylor*, 185 Mich. App. 1, 4-5, 460 N.W.2d 582, 585 (1990). These three lines of cases foreclose any challenge to the admissibility of the scientific evidence introduced at petitioner's trial under state law. Because any objection would have been futile, counsel was not ineffective for failing to challenge the admissibility of the evidence. *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995) (counsel not ineffective for failing to raise meritless objection).

Petitioner nevertheless contends that, apart from state law admissibility issues, the introduction of this evidence denied him a fair trial because it violated the presumption of innocence. In support, petitioner relies on several state cases which have reached this conclusion. *See State v. Skipper*, 637 A.2d 1101 (Conn. 1994); *State v. Kim*, 398 N.W.2d 544 (Minn. 1987); *State v. Boyd*, 331 N.W.2d 480 (Minn. 1983); *State v. Spann*, 563 A.2d 1145 (N.J. Super. Ct. App. Div. 1989), *aff'd*, 617 A.2d 247 (N.J. 1993); *State v. Hartman*, 426 N.W.2d 320 (Wis. 1988). A number of other courts, however, have rejected the analyses of these cases, concluding that statistical evidence of paternity does not violate the presumption of innocence. *See Grundy v. Dailey*, No. 3:05-CV-106-S, 2007 WL 1200141, at *4 (W.D. Ky. Feb. 26, 2007); *Martinez v. State*, 549 So. 2d 694, 696-97 (Fla. Ct. App. 1989); *Butcher v. Commonwealth*, 96 S.W.3d 3, 9-10 (Ky. 2002); *Commonwealth v.*

*Gomes*, 526 N.E.2d 1270, 1280 (Mass. 1988); *State v. Smith*, 735 S.W.2d 831, 834-35 (Tenn. Ct. App. 1987); *Griffith v. State*, 976 S.W.2d 241, 249-50 (Tex. Ct. App. 1998). And as noted above, apart from the paternity context the courts have repeatedly held that DNA statistical evidence is admissible in a criminal trial to establish the identity of the defendant as perpetrator. Thus, any objection on this basis would likely have failed, and thus petitioner cannot show that counsel was ineffective.[3]

Petitioner also contends that counsel was ineffective for failing to secure a defense DNA expert to challenge the prosecution's DNA evidence. This claim is without merit. First, defendant has presented no evidence that there were any expert witnesses who could or would have testified in the manner he suggests in his brief. He has identified no specific experts, nor pointed to anything which suggests that such experts would have testified on his behalf. In these circumstances, defendant has failed to meet his burden of establishing prejudice. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001); *Tafaya v. Tansy*, 9 Fed. Appx. 862, 871, 2001 WL 557971, at *6 (10th Cir. 2001); *Dell v. Straub*, 194 F. Supp. 2d 629, 650-51 (E.D. Mich. 2002) (Friedman, J.).

---

[3]Petitioner likewise cannot assert that he was prejudiced by counsel's performance because counsel's failure to object precludes him from bringing an independent claim based on the introduction of the statistical evidence here, regardless of what the state courts would have done with counsel's challenge to the evidence. In the first place, petitioner raises no such independent claim here. Second, there is no "clearly established Federal law as determined by the Supreme Court" which prohibits the introduction of statistical paternity evidence in a sexual assault case, and in light of the authority discussed above permitting such evidence to be introduced it cannot be said that the introduction of the evidence represented an "unreasonable application" of any clearly established federal law governing the admission of evidence in state criminal trials. Because any objection to the evidence would have been denied by the state courts and any challenge to the admission of the evidence in this Court would have failed, petitioner cannot show that he was prejudiced by counsel's failure to object to the admission of the evidence.

Second, petitioner cannot show that he was prejudiced by the absence of a defense expert. For the most part, petitioner claims that a defense expert could have challenged the reliability of the DNA and statistical evidence. But, as noted above, such testimony would not have rendered the prosecution's evidence inadmissible. Counsel cross-examined the DNA experts, and argued extensively to the jury that the DNA and statistical evidence was problematic. *See* Trial Tr., dated 4/10/03. And, petitioner has identified no expert who would have been willing to testify as petitioner claims an expert could have. "Speculation about what an expert could have said is not enough to establish prejudice." *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997). In light of the victim's testimony and the corroborating evidence apart from the DNA evidence, counsel's general attack on that evidence, and petitioner's failure to identify any specific, exculpatory expert testimony that could have been presented, it is not reasonably probable that a different outcome would have resulted if counsel had retained a DNA expert and presented his testimony at trial. *See Hamblin v. Mitchell*, 354 F.3d 482, 494 (6th Cir. 2003) (petitioner not entitled to relief where "even if defense counsel had called an expert witness to testify[,]…it would not likely have changed the outcome" of the case.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his claims relating to counsel's handling of the DNA evidence.

### d. Failure to Seek Probable Cause Hearing

Petitioner next contends that counsel was ineffective for failing to seek a probable cause hearing in the trial court. He argues that the criminal complaint was based only the unsworn accusation of the victim, and was not supported by any objective evidence. Therefore, he argues, there was no probable cause either for his arrest or to obtain his blood for DNA testing. Petitioner cannot show that counsel was ineffective for failing to seek a probable cause hearing.

Contrary to petitioner's argument, the Fourth Amendment's probable cause requirement did not require objective evidence to support his arrest and the seizure of his blood for DNA testing. "An eye witness's statement that . . . she . . . was the victim of a crime is generally sufficient to establish probable cause." *See United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006); *see also*, *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006); *Ahlers v. Schebil*, 188 F.3d 365, 370-71 (6th Cir. 1999). Further, once the police had established probable cause, they were not obligated to investigate further for exculpatory evidence which may have exonerated petitioner. *See Harness*, 453 F.3d at 755; *Klein v. Long*, 275 F.3d 544, 551-52 (6th Cir. 2001). Thus, petitioner cannot show that counsel was ineffective for failing to challenge the probable cause for his arrest and the seizure of his blood.

To the extent that petitioner attacks counsel's failure to challenge the technical aspects of the criminal complaint, he cannot establish prejudice. Contrary to petitioner's argument, even if the complaint was technically defective, the trial court did not lose jurisdiction over petitioner. *See People v. Burrill*, 391 Mich. 124, 214 N.W.2d 823 (1974). And, once petitioner was arraigned on a separately filed information,[4] any defect in the complaint became irrelevant to the validity of his subsequent trial and conviction. *See People v. Hill*, 44 Mich. App. 308, 317, 205 N.W.2d 267, 273 (1973), *overruled in part on other grounds*, *People v. Mayberry*, 52 Mich. App. 450, 217 N.W.2d 420 (1974). Thus, any challenge to the complaint would have been meritless, and counsel was not ineffective for failing to pursue such a challenge.

*e. Failure to Object to Irrelevant Evidence*

---

[4]The trial court docket sheet, filed as part of respondent's Rule 5 materials, shows that petitioner was arraigned on the information on September 26, 2002.

Petitioner also argues that counsel was ineffective for failing to object to irrelevant evidence introduced by the prosecution. Petitioner only briefly addresses this claim in his petition, and does not address it at all in his memorandum in support of the petition. Thus, it is not entirely clear exactly what petitioner challenges in this claim. In his habeas application, petitioner claims that counsel allowed the victim to lie about skipping school to visit her boyfriend Darryl Brown's house around the time of the offense and to change his name from Darryl Brown to Donald Brown without any objection from counsel. Petitioner also claims that the prosecution failed to formulate an adequate foundation for the styrofoam box which contained the fetus, thus providing an inadequate chain of custody, and that the prosecution failed to produce an expert witness report. Finally, although not mentioned in his petition, in his state court *pro per* brief, petitioner contended that counsel was ineffective for failing to object to the hearsay testimony of the victim's mother. The Court should conclude that petitioner is not entitled to habeas relief with respect to any of these claims.

Prior to trial, counsel provided notice of his intent to question the victim regarding her sexual contact with Darryl Brown, with whom she may have skipped school on a day in the time frame of the sexual assaults. *See* Trial Tr., dated 4/8/03, at 4-7. Applying the rape-shield law, the trial court ruled that counsel could only ask the victim whether she had been with Brown, but not whether they had had sex. Counsel could then argue any reasonable inferences from this testimony to the jury. *See id.* at 8. On cross-examination, counsel questioned the victim, who testified that she did not skip school with Brown, but only had taken his bus home from school because she had missed her bus. She also denied having spent any time in his house. *See* Trial Tr., dated 4/9/03, at 76-78. Contrary to petitioner's argument, there is nothing more that counsel could have done with respect to this

issue.  He attempted to get the evidence in completely, but was prevented from doing so by the trial court's evidentiary ruling.  Consistent with that ruling, he did question the victim regarding the time she spent with Brown, attempting to raise an inference that they may have had sex.  Counsel did all that he could do on this issue within the confines of the trial court's ruling.  Further, petitioner has not suggested how he was prejudiced by the discrepancy in the victim's testimony regarding Brown's first name.

With respect to the chain of custody issue, petitioner cannot show that counsel's performance was deficient.  "Once a proper foundation has been established, any deficiencies in the chain of custody go to the weight afforded to the evidence, rather than its admissibility." *People v. White*, 208 Mich. App. 126, 133, 527 N.W.2d 34, 37 (1994); *see also*, *Dell v. Straub*, 194 F. Supp. 2d 629, 653 (E.D. Mich. 2002) (Friedman, J.).  Establishing a foundation for the admission of physical evidence requires no more than that the "articles be identified as that which they purport to be and that the articles are shown to be connected with the crime or with the accused." *People v. Furman*, 158 Mich. App. 302, 331, 404 N.W.2d 246, 259 (1987).  Here, Sergeant Sanchez testified that he took the styrofoam container to the Women's Clinic, personally witnessed the clinic staff place the aborted fetus and ice into the container, and took the container with him to the Detroit Police lab. He signed the container in as evidence, it was continually in his possession until he arrived at the lab, and he did not open the container.  *See* Trial Tr., dated 4/9/03, at 148-51.  This testimony was sufficient to establish a foundation for the admission of the evidence.  *See* MICH. R. EVID. 901(b)(1) (foundation may be established by "[t]estimony that a matter is what it is claimed to be."); *People v. Jambor*, 271 Mich. App. 1, 5, 717 N.W.2d 889, 892, *rev'd*, 477 Mich. 853, 720 N.W.2d 746

(2006).[5]

Because a proper foundation was laid for the admission of the styrofoam box and the aborted fetal tissue, any problems with the chain of custody went to the weight of the evidence, and not its admissibility. Thus, counsel had no valid objection to the admission of the evidence, and could only attack its reliability. Counsel vigorously did so, questioning Sanchez and the two forensic scientists–Paula Lightel and Heather Spillane–regarding the time lapses involved in the testing process and the conditions under which the fetal tissue was stored. *See* Trial Tr., dated 4/9/03, at 161, 169, 181-82, 225-26, 227-29. Counsel reiterated these points to the jury during closing argument. *See* Trial Tr., dated 4/10/03, at 58-59. Again, counsel did all that he could within the confines of the rules of evidence to attack the custody of the fetal tissue.

With respect to the expert reports, petitioner has cited and I have found no rule of evidence which requires that a party introduce such a report at trial in conjunction with an expert's testimony. And in any event, Spillane's report was introduced at trial, *see* Trial Tr., dated 4/9/03, at 209-10, and admitted into evidence, *see id.*, dated 4/10/03, at 4. Likewise, Dr. Scarpetta's report was introduced and admitted into evidence. *See id.*, at 16-17, 35. Thus, petitioner cannot show that counsel was ineffective for failing to require introduction of the expert reports.

Finally, petitioner cannot show that counsel was ineffective for failing to object to the testimony of the victim's mother. At trial, Monica Smith testified that several months after the sexual assaults her daughter told Smith that she was pregnant, and that an unknown man had raped

---

[5]In *Jambor*, the court of appeals noted this general rule but concluded that the evidence at issue in that case, fingerprint cards taken by the police, had not been properly authenticated. The Supreme Court reversed on this conclusion, holding that a proper foundation was laid for the admission of the fingerprint cards based on officer's testimony.

her. *See* Trial Tr., dated 4/9/03, at 97. Smith took the victim to her mother's house, where the victim told her that petitioner had raped her. *See id*. at 99. Petitioner contends that this evidence was irrelevant and inadmissible hearsay, and thus that counsel should have objected. The court of appeals rejected this claim, concluding that the evidence was cumulative. *See Settles*, 2004 WL 2827681, at *3, slip op. at 3. This determination was reasonable.

First, counsel had good reason for not objecting to this testimony. While the victim ultimately told her mother that petitioner had raped her, the mother's testimony also established that the victim had hidden her pregnancy for several months and that the victim had initially accused an unknown man of raping her. Thus, the mother's testimony provided support for counsel's argument that the victim was not credible. *See* Trial Tr., dated 4/10/03, at 60. Second, as the court of appeals noted, the evidence was cumulative to the victim's own testimony. In light of the victim's testimony and the corroborative DNA evidence, it is not reasonably probable that the outcome of the trial would have been different had the mother's testimony regarding her daughter's statement been excluded. *Cf. United States v. Beasley*, 102 F.3d 1440, 1450 (8th Cir. 1996).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his claims that counsel was ineffective for failing to object to inadmissible evidence.

### f. Failure to Request Lesser Offense Instructions

Finally, petitioner contends that counsel was ineffective for failing to request instructions on lesser included offenses. The Court should disagree. Petitioner was charged with both first and second degree criminal sexual conduct on the basis of the victim's age and petitioner's residence in the same household of the victim, *see* MICH. COMP. LAWS §§ 750.520b(1)(b)(i), 750.520c(1)(b)(i), and the trial court instructed on these elements, *see* Trial Tr., dated 4/10/03, at

71-73.  Third and fourth degree criminal sexual conduct do not require a showing that the victim resided in the same household as the defendant.  *See* MICH. COMP. LAWS §§ 750.520d(1)(a), 750.520e(1)(a).  Because the evidence at trial established that petitioner and the victim resided together and there was no evidence to the contrary, a request for instructions on third and fourth degree criminal sexual conduct would not have been supported by the evidence.  *See People v. Norman*, 184 Mich. App. 255, 260-61, 457 N.W.2d 136, 140 (1990); *People v. Favors*, 121 Mich. App. 98, 112, 328 N.W.2d 585, 591 (1982).  Thus, counsel was not ineffective for failing to request lesser offense instructions.  *See Lee v. Ricks*, 388 F. Supp. 2d 141, 157 (W.D.N.Y. 2005) (counsel not ineffective for failing to request instruction which was not warranted under state law).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will

not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 1/29/08

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on January 29, 2008.

s/Eddrey Butts
Case Manager